We will now hear argument in George Ebert v. Dennis Braddock, cause number 03-35956. Mr. Rutzik? Thank you. Good morning, Your Honors. My name is Bill Rutzik. I represent the plaintiff class, and I would like to reserve five minutes if I may, if I may. You may. We submitted, and somewhat unusually, at least in my experience, a number of supplemental cases that were decided after the briefing, and what they showed is that four additional circuits, besides the Ninth and the Second and the Seventh Circuits, whose cases we had cited, have ruled that a party may pursue a supremacy clause preemption claim, which is the claim we're talking about here, even in the absence of a statutory right of action. And two of those cases, well actually three, are particularly significant. Since they aren't in the brief, I want to spend a moment or two on them. One of them, the Quest v. Santa Fe case, which is the Tenth Circuit case, is relevant for two reasons. One, it raises the exact kind of issue we have here, because the court in Santa Fe found there was no 1983 action, which was one of the issues, and affirmed the district court, which had found no 1983 action, but nevertheless found that if I may, let's do a couple quotes. This is at note one. A federal statutory right or right of action is not required where a party seeks to enjoin the enforcement of a regulation on the grounds that the local ordinance is preempted by federal law. I submit that's directly on point. What was the regulation in that case? It was under the Telecommunications Act. Santa Fe had implemented a regulation that Quest didn't like, which they said was preempted under the Federal Telecommunications Act. Let me give you the concern that's behind that question. The reason why there's generally not a right of action under a federal spending condition is that the remedy is the interruption of spending. And I'm wondering, it's a problem of standing. If the remedy, there being no private right of action, if the remedy for Washington's violating this federal program is to cut off federal Medicaid funds, how can that possibly help your clients and give them standing to raise this issue? I take your question as applying both to standing and to the right of cause of action. Well, I'm not so sure those are separable. And I think you've established that people who are definitely hurt by a state regulation, even though there's no private right of action, can sue and argue that the state regulation or statute or something is preempted federally. But the relief, if they win, is to be relieved of some oppressive state thing that is hurting them. And it seems to me the relief, if you win, is to cut off Medicaid funding for the state of Washington. No, that's not the relief we seek, nor is it the relief that we would be entitled to. This claim was only against the state. What you're referring to would be the federal government could, under some circumstances, if they determine that the state didn't comply with a necessary regulation, could terminate it, could terminate funding. We are not seeking that. And in doing so, we are acting exactly as did the plaintiffs in a number of Supreme Court cases. And if I may go back, the King v. Smith case, which we cited, which is the 1968 U.S. Supreme Court, and Rosado v. Wyman, both of which were U.S. Supreme Court cases in which the claim was only against the state's department. I think a preemption cause of action takes you far enough to invalidate whatever the state has done that's inconsistent with federal law. I don't know that a preemption cause of action authorizes you to require the state to do something. Well, in both King v. Smith and Rosado, that's precisely what the Supreme Court affirmed. They affirmed an injunction against a state. This was under the AFDC program, which is part of the Social Security Act. They enjoined the state application of state regulations that were inconsistent. And they actually were supremacy clause cases, which I think even used the term preemption. They did not go for the nuclear remedy. They didn't say anything.  And we want essentially the relief that was sought, and this is a very recent case, which I think addresses your point, in the Sanchez, I'm sorry, Planned Parenthood v. Sanchez, the very recent Fifth Circuit case, which is also a spending clause preemption case. That's under Title X of the Social Security Act. SSI, if this is relevant, is under Title XVI. So you just want a declaratory judgment that says, Washington, you can't do this. Go back and start over. An injunction against them applying the preempted state regulations. It will never come to what Judge Canby, what you were referring to, so long as the state complies with the regulation and therefore meets the situation. This came up, and the history of this case and the record demonstrates this, if I may. Washington originally, this involves about $29 million, which the state is required to spend. They first had a plan, we're going to basically send vouchers to developmentally disabled people to be used for paying rent or certain specific things. In July of 2003, the Commissioner of Social Security, which was the relevant governmental agency, said essentially for that claim the same thing that we're asking the court to say for our claims. No, vouchers don't work. You cannot use vouchers to meet your maintenance of effort. The Commissioner didn't say we're eliminating Medicaid. They didn't do that. They said, no, you can't use that money. What the state did, they were essentially enjoined, though it was by an administrative agency, from following the regulation which they had which said we're going to use vouchers. What the state did is they changed the method. That's all we're talking about here. We are not saying the state can't comply. If we were to do that, though, how does that square with the regulations under the Social Security SSI supplemental payments regulations that say that if the state takes over the administration of the SSP program that it gets to determine eligibility, implying that eligibility requirements might be different for SSP payments than it would be for those who are eligible for SSI payments? The distinction here is the regulation you're talking about allows the state, for example, to make decisions as to which SSI recipients should get this SSP money. As long as it's federally administered, everybody has to get it. Here, they can choose a subgroup, but Mr. Ebert may or may not be an appropriate representative of that class. Is that right? Well, he will be. He likely will be. He hopes to be. I can do better than he hopes. I can do likely. Here, I'm addressing the third of what I'll refer to as the Lujan standing criteria. What the state did, in part, after the federal government said, no, you can't use vouchers, is they said, well, in order to pay this $29 million, we have to amend our plan. The way they amended the plan was to increase the numbers of people who qualify for the SSP program. They added the agent. SSI is agent, disabled, and blind. The bulk of the people, at least in Washington, are disabled, but the age at over 65 and poor represented about 15,000 people. Mr. Ebert, as we sit here today, is over 65. And so the state changed its plan to institute. The state plan now says that people over 65 get money. The reason that Mr. Ebert and the agent care about it is that under the state plan, the agent are in effect like a residuary beneficiary in a will. The way it works is $29 million is what the state has to spend, that they're going to spend it. And even in their brief, they say, we have no intention of not spending it. They have to spend the money. If, to the extent that the money spent for the developmentally disabled, which is the people for the regulations that we're challenging, are in effect, to the extent that you declare or there's an injunction against using those regulations to do it, that will necessarily require the money to flow from the developmentally disabled to the residual category, which happens under the state's own option to include the agent. So given the plan that currently exists, it will, and that's why I say it will likely, unless things change, the status quo right now is money that isn't sufficient for the developmentally disabled goes to the agent in blind, pursuant to the state plan. So is the problem that the pie is bigger, and so those who are in the class receive less money? I thought Mr. Ebert was not receiving money at all under the SSP program as a result of the current regulations. The reason, not exactly. What has happened, when they started, when they started before the commissioner said, no, vouchers don't work, the two categories of people, the one tiny one that I'm not going to bother with, is developmentally disabled people of a certain category and SSI recipients with spouses, whether they're agents or disabled. Mr. Ebert was neither of those. What happened is about August of 2003, after the commissioner of SSA said, no, you can't do it, they added this category of agent in blind. At the time, to be specific, he wasn't over 65. So he wasn't eligible at that point. At that moment, he wasn't, but more than 15,000 of the class members were, because the class, and I think this is a point worth making, the class is essentially everybody. The class is everybody except the developmentally disabled. In other words, the class is about 100,000 people. The number of developmentally disabled people who are receiving SSP was approximately, and this is in the record, 2,000 people. Counsel, couldn't the state of Washington decide to expend all of its monies to assist developmentally disabled individuals? As long as they comply with the federal regulations, then this goes to our substantive challenge. Yes, there is a way they could do it, but they didn't. And more than that, what I'm suggesting is there's a structural reason that it's very unlikely that they would. This group of people are, some are living at home, some are living in group homes. The monies that they're, their needs are being met by this program. Our substantive claim, and this goes to one of our substantive claims, is that it's essentially a, it was a sleight of hand. It was, they said, before people were getting money, strictly state money for all of their needs, the state then said, by definition, if you're on SSI, you can't get state money. Oh, and by the way, we're going to give you the SSP in an amount that's actually slightly less than what you have been getting. Our substantive position, which the district court didn't deal with, is that the regulations, the statute, define that the state supplementation has to increase your income. Here, it actually decreased their income because they. What requirement, where is the requirement that the income has to be increased? Where does that come from? Well, it's 20 CFR, where it's most clearly articulated, 20 CFR 416-2000. It's in our appendix. I think it's page 10 of the appendix, if you'll give me just a moment. So you're saying that that regulation requires the state of Washington to increase the income? No, it requires that the state supplemental payments must be an increase in income. But is that true, even if the state cannot make any payments, but to put all the money into the developmental disabled programs? They have to increase the income of those people to whom they give it to. I apologize. But they don't have to give any money at all. Yes, they do. In order to participate in the Medicaid program, they do. In other words, the point of this law, which was, and it's a very long title, but it's also in the things like 1382A, was to require that it's, in effect, a maintenance of effort. In this case, if you've been paying $29 million in state supplement in year six, you have to pay at least that. Not pay. You have to put that much money into the program, right? No, it's, well, I'm not sure. Payment to individuals, that's what you're saying? Yes. Okay, that's what I'm wrestling with, because what I hear you saying is that the amount of money that goes to individual beneficiaries cannot be diminished. And if it takes more than $29 million to do that, because the state has now expanded the class of potential beneficiaries, then the state's just going to have to kick in more money to make up the difference. No, I apologize. Let me be as specific as I can. That isn't what I was trying to say. The requirement, the maintenance of effort requirement is $29 million. To what end? And that is money that the state must pay to some SSI people. The state can choose to whom it makes the payment, but it has to be in the class of SSI recipients. Now, is your argument that there must be a cash payment? Is that your argument? Yes, and that is absolutely clear from the regulations. Indeed, that was where the state got in trouble in July of 2003, because they were saying a voucher. No, not a voucher, but into programs. Oh, no, it's not a voucher. No, it's cash. It's a check. It has to be our warrant. It has to go literally. To go back to Judge Rawlinson's question, I still don't understand why Washington can't simply say, we are going to allocate $28.9 million, whatever the number is, $29 million, to use a rounded number, but we're only going to pay SSP payments to the blind, and we're not going to pay SSP payments to anybody else now that we are administering the program. And if by pay you mean sending checks, the answer is they could do that. Well, I'm not worried about the form of the payment. I'm not sure I frankly understand what the difference is between a voucher and a check. I mean, I know what it – The voucher goes to the – But, I mean, it's still real money, and it's still an obligation that the state of Washington has to pay out of the general treasury. The voucher goes to the landlord, in effect. Well, I understand. The question is, who gets it? And you're saying it doesn't go to the beneficiary, even though the state is arguing it inures to the benefit of the recipient. That's right. But without regard to that, I still want – I'm not clear on your answer to Judge Rawlinson's question. Could the state simply say, we're only going to give money to the blind? Yes, they could say that, and then they would have to give $29 million in cash payments that would increase the income of the blind. My point in response to Judge Canfie's question is they have not done that. They have chosen to give it to the aged, the blind, and the developmental. Now, the district court didn't reach any of this, of course. No. And I want to get back to their – your cause of action that the district court found defective is a supremacy clause, cause of action. That's right. How does this get to be a supremacy argument when you haven't sued the federal government and the federal administrator has said that the Washington plan is in accord with federal law? There's no conflict. Where does the supremacy clause come in? Actually, three points. One is, ultimately, it will be this court, it's the judiciary, rather than simply the executive, that determines whether there is a conflict between the state regulations and the federal law. That's number one. And the Planned Parenthood case was exactly – it's very 2005 circuit case by Judge Higginbotham – was exactly that situation. Secondly, our point – and I think the record illustrates it. All that happened – and this is in the record. It's, for example, ER 171, 172, 173. The federal government said – this was in August, basically, to the state – we want your assurance that – when receiving – and the state then wrote back and said, yes, A through E are true, without backup, without anything. The commissioner then said, okay. And that's something the commissioner, I suppose, could do. But my point being that the commissioner didn't have this information. They didn't have the records in front of them. And we have demonstrated through depositions, which they didn't have, and through regulations, that, in fact, it wasn't so. Mr. Ruskin, your time has expired. I'd like to hear from Mr. Williams. Thank you. May it please the Court. My name is William L. Williams. I'm a senior assistant attorney general, and I'm here this morning representing the defendants in this matter. The district court decision should be affirmed for three reasons. One, plaintiff lacks standing because he fails to satisfy two of the three requirements of the traditional durand standing analysis. Secondly, there's no standing under the supremacy clause because there's no federal statute giving him a right. And third, the court – the plaintiff lacks standing because the commissioner of Social Security, who Congress has vested the full authority to administer this program, has conclusively determined that the state is in compliance for 2003, which is the only year that is before the court. The three – So you're asking us to take judicial notice of that? I understand that that occurred after the district court ruled. Is that correct? Well, there are two pieces to it. In October of 2003 – earlier in October, before the district court ruled, the commissioner approved the Washington plan, and that is in the record and was before the district court. However, subsequently in March of 2004, in a letter that I attached to our brief, the commissioner reviewed and said, not only did we approve your plan, we're now satisfied you've implemented it the way you said you would and has found the state to be in compliance for 2003. So it was just reconfirming what had preliminarily been determined? Is that your point? Well, I believe it's more than reconfirming. I think it's confirming that not only was there a plan that was approved, but the plan was actually implemented and it met the requirements of the statute. The standing requirements are threefold. One is there must be an actual injury, and we would concede for those purposes that the elimination of the $25 per month payment is an injury. Secondly, there must be a causal connection between the alleged injury and the act that is being complained of. And I think that's important here because what plaintiffs are complaining about is a particular category of payments that are being made to persons with developmental disabilities. But the injury, the cessation of the payment, came before that when the legislature decided to redirect the state supplemental program to other sources. And there's no question that once the state took over administration from the Social Security Administration, that the state had discretion to determine eligibility conditions for the SSP. And so there isn't a causal connection between the particular payments to persons with developmental disabilities that the plaintiff is complaining about and the loss of the $25 per month payment. So your point is essentially that the beneficiaries do not have a vested interest once payments begin to them in receiving that amount or more. Or any payment at all because the state has plenary discretion. They still get SSI, they just don't get SSI. Absolutely. They get their SSI directly from the Social Security Administration, and those who are determined by the state to be eligible for an SSP get that directly from the state government. Whereas under the old system prior to 2002, they got both payments in one check from the Social Security Administration. The third prong of the standing requirement is that plaintiffs must establish that there's a substantial likelihood that the relief that they are seeking will, in fact, remedy the harm that is caused. And I think that was the subject of a colloquy that was going on in counsel for plaintiffs toward the end of his argument. And that is, as Judge Rawlinson's question indicated, the state could decide to focus all of their SSP payments on one category or another. Persons with developmental disabilities and others, as long as they fall within that category. So there is no substantial likelihood. It is merely speculative in the words of some of the cases. If the likelihood of a remedy coming from a judicial determination is only speculative, that's insufficient to confer standing. With respect to the Supremacy Clause case, all of the cases that were cited by plaintiffs in their reply brief and all of the cases that they've cited in supplemental authority involved federal statutes that conferred some kind of right on the plaintiffs in those cases. Maybe not a private cause of action for purposes of 1983, but some element of right. They had a right to have their business affairs governed by a federal statute, ERISA in some cases, the Telecommunications Act in some cases, the National Banking Act in some cases, or in the Planned Parenthood case, a right to have benefits received under the detailed regulations of the Medicaid Act and the implementing regulations. That kind of right does not exist in this case because plaintiffs have no right to any SSP or any particular amount to an SSP. So there is no conflict for the Supremacy Clause to resolve. I think this may be a unique situation because typically when the federal government, particularly when the federal government provides funding, they put very detailed regulations in and create the kind of enforceable rights that were involved in Planned Parenthood and some of these other cases too. You're not disputing those cases that acknowledge, as Mr. Rudzik argued in opening, that there are a class of cases where there may be no identifiable statutory cause of action, no civil rights claim, but that nonetheless a party may invoke the Supremacy Clause if he or she is otherwise injured and meets these three Lujan factors in challenging the implementation of, let's say, a municipal ordinance which he alleges is in violation of the Supremacy Clause. If the injury is in the form of deprivation of a federally created right of some sort, that's particular to that individual or organization. But yes, no, we're not disputing that in general. I think this may be a unique case. I'm not familiar with any other statute where the federal government imposes a requirement but allows broad discretion of the state as to how the requirement is going to be implemented. And finally, what I think I've already addressed, the issue of the fact that the commissioner of Social Security has already made a determination with respect to 2003. And frankly, when the court asked plaintiff what kind of relief he was seeking, we've been trying to figure that out all along as well. At times he says he's only seeking prospective relief. On the other hand, he's been arguing that the state has not met its maintenance of effort requirement. And as Judge Canby's question pointed out, that in fact would have a catastrophic effect on not only the plaintiffs but a lot of other people who depend on Medicaid for their health care. But I suppose this is to state the obvious. If we agree with you that Mr. Ebert does not have standing for the reasons you've articulated, we don't need to resolve the question of whether the state can make in-kind payments by vouchers to landlords as opposed to cash payments directly to beneficiaries. Mr. Ebert isn't the person who can raise that complaint. I agree you don't need to reach the merits. I do want to clarify one thing. The record is clear that the state plan that was approved by the commission in October and implemented did not involve paying vouchers to landlords. The payments were made. That had been one of the earlier proposals. As these things go, the legislature made a decision, directed it to an administrative agency, and they went through several formulations trying to comply with that, working with the Social Security Administration. That had been one of the earlier proposals that would be handled that way. But the Social Security Administration, consistent with the regulations that the payments have to be in cash, said no, that won't work. So the plan that was approved, the state made the payments to the recipients. Now, they're paid to the recipients or their representative payee, which is a term of honor under the Social Security Act. A guardian or something of that nature. So the payments were made in cash. The need was assessed based on a need for a particular level of service. The payment was made in cash to the recipient, and that does comply with the statute. But, again, that goes to the merits, which, as your question indicates, the court does not need to read. What this case really involves is the difficult choices that state legislatures are often faced with in deciding what groups are going to receive public assistance and what are not. And that's particularly difficult in times of declining resources and increasing demand, which is precisely what the Washington legislature was faced with in 2002. There was a $1.25 billion budget shortfall. A legislature could have simply discontinued all state-funded payments to persons with developmental disabilities and left the SSP program as it was, paying $25 a month to 100,000 people. You concede that, notwithstanding the budget crisis, the state would still have to figure out some way to come up with $29 million, or if there was a shortfall, make it up in a subsequent year. In a subsequent year, and that's exactly what happened. And instead of doing that, the legislature made the determination, and reasonable people could disagree with whether this was the right determination, but they decided rather than cut the benefits to developmentally disabled persons, they would substitute some of those. And, in fact, the amount of money that was available allowed them to provide services to people who had been on a waiting list. And that's reflected in the Budget Act, which is cited in our brief. And that was a reasonable policy decision for the legislature. It was one that was within the scope of discretion that the Social Security Act in implementing regulations grants to states. And for the reasons that we've articulated, we believe it was within the state's discretion. We request that the court affirm the district court decision dismissing the complaint and if the court has no further questions, I'll raise the rest of my time. Thank you, Mr. Williams. Thank you. I'll give you a couple of minutes since Mr. Williams has graciously finished. Let me make, under the state's own plan, which is in the record, there is no dispute that more than 15,000, perhaps 20,000 of the class members will get more money under the state's own plan if some of the money that is given to the developmentally disabled doesn't qualify under the federal regulations. The getting of more money meets both the causation and the likely result test. Well, let me ask you this question. In light of Mr. Williams' representation that we don't have the voucher check problem, I assume implicit in what he was telling us is that the legislature is still coming up with $29 million. Now aren't we really arguing about who gets it? The voucher check problem was not our substantive claim. That had been dealt with. Well, forget about vouchers and checks. If the legislature is still kicking $29 million into some subclass of this group, then where's the beat? Because it's being used in a way that is contrary to the federal law. They are still being used. Notwithstanding the approval by the commissioner that the program complies with federal law. Notwithstanding the approval because that approval was based on, I'll call it misinformation. It was based simply on the state saying so. And that is never the criteria. If the criteria is we say it's in compliance, that ends the inquiry. There would be very little point for a judiciary. The point of a trial like this is we did discovery. Back to the question, hence to the point of beginning. What relief is it that Mr. Ebert is asking us to award him? Is it some sort of citizen taxpayer standing to complain that the state has adopted regulations which, notwithstanding the commissioner's imprimatur, are in violation of federal regulations? The relief is that a declaration and an injunction saying that two state regulations don't comply with the federal law, which will then mean that about $16 million that they're using to make their maintenance of effort is determined not to meet the Because they have to make up the money. Even if he gets not a penny of it. But he will. I mean, that's my point. He is now falls in the category of agent. He will get some of that money under their own plan. And so it's a very direct benefit to him. You are now three minutes into your rebuttal. Thank you very much. The case was well argued on both sides, and it will be submitted for decision. We will now hear argument in the last case on the calendar. Jane Doe versus the United States of America, cause number 04-35810.
judges: Canby, Tallman and Rawlinson